Document Number Case Number
022                95-CR-0073-C
United States District Court
Western District of Wisconsin
Theresa M. Owens

Filed/Received
06/29/2007 03:43:52 PM CDT

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN
_____

UNITED STATES OF AMERICA,

                                                                                               REPORT AND

                              Plaintiff,                                           RECOMMENDATION

     v.

                                                                                               95-CR-073-C

UDARA ASELA WANIGASINGHE,

                              Defendant.
_____

REPORT

On August 30, 1995, a grand jury sitting in this district indicted defendant Udara Wanigasinghe on six counts of bank fraud. Wanigasinghe has moved to dismiss the charges for violation of his Sixth Amendment right to a speedy trial. *See* Dkt. 9. The government opposes the motion, alleging that Wanigasinghe knew or should have known of his indictment, avoided prosecution, and has suffered no prejudice from the 11½ year delay. The salient factors cut in both directions and probably could justify a decision in either direction. Frankly, my view of this case mirrors that of the dissent in *Doggett v. United States*, 505 U.S. 647, 659 (1992)(Thomas, Scalia, JJ., and Rehnquist, C.J., dissenting): absent a showing of actual harm from delay, a defendant's Sixth Amendment right to a speedy trial is not even implicated. The Court's opinion, however, was to the contrary: there comes a point when the length of a negligent delay requires dismissal of an indictment. That appears to the point we have reached in this case. For that reason, I am recommending that this court grant the motion and dismiss the indictment.

FACTS

Over seventeen years ago, defendant Udara Wanigasinghe, a native of Sri Lanka, obtained a student visa to study in the United States at the University of Wisconsin-Eau Claire. This visa was valid from January 1990 until April 1995. Wanigasinghe graduated in May 1994, but stayed in Eau Claire until his student visa expired the following April. In anticipation of his visa expiring, Wanigasinghe obtained employment in Colombo, Sri Lanka and made plans to return.

According to the indictment returned against Wanigasinghe, he made some other plans in anticipation of his imminent departure: the grand jury has charged that from about March 15, 1995 until about April 19, 1995, Wanigasinghe defrauded five different banks by opening accounts, depositing forged and stolen checks, and making quick withdrawals before the deposit items bounced, thereby extracting $17,650. The indictment alleges that Wanigasinghe also wrote $2,677.00 worth of bad checks against his existing account at a sixth bank.[1]

---

[1] In its opposition to dismissal, the government has submitted evidence (to which Wanigasinghe objects) that Wanigasinghe also racked up $2882 in credit card charges that he never paid. Since this conduct is similar in scope and nature to that actually charged in the indictment, there is no need for the court to consider it when weighing the factors salient to dismissal. If it were necessary to consider this evidence, the court would deem it relevant to the motion and would allow the government its statutory opportunity to lay a firmer foundation if necessary. *See* 28 U.S.C. Sec. 626(b).

The same holds true for the government's evidence that shortly before his departure Wanigasinghe sent a lulling letter to his landlord claiming to be on a temporary internship in Singapore and that he advised his ex-girlfriend that he was moving to Cincinnati and would re-contact her once he got settled. Wanigasinghe sent her another letter announcing that he would not be reuniting with her and that "I will be living in Sri Lanka once I get old." This is cumulative evidence of the government's point that Wanigasinghe intended to leave America without repaying fraudulently-incurred recent debt.

Around the end of April, 1995, Wanigasinghe returned to his homeland, where he lived openly in Colombo (pop. ~640,000, and the national capital, *see en.wikipedia.org/wiki/colombo*) under his own name and worked as an employee in a financial investment company.

On April 30, 1995, the grand jury in this district returned its bank fraud indictment against Wanigasinghe. The FBI agent who testified to the grand jury reported that he had a "rough idea" that Wanigasinghe now was in Singapore or Sri Lanka. The government issued a warrant for Wanigasinghe's arrest and entered it into the NCIC database on August 31, 1995, where it remained active. The government sealed the indictment against Wanigasinghe pending his arrest.

Sri Lanka has an extradition treaty with the United States. Notwithstanding the FBI's "rough idea" that Wanigasinghe might have returned home (a commonsensical notion bolstered by Wanigasinghe's brush-off letter to his ex-girlfriend), the government never inquired of Sri Lanka whether Wanigasinghe was present in that country.[2] On the other hand, UW-Eau Claire knew where Wanigasinghe lived in Colombo and sent him alumni information on a regular basis. Apparently no government agent ever contacted Wanigasinghe's alma mater to ask if it knew where to find him. Wanigasinghe's attorney has submitted a Google search for "Udara Wanigasinghe." This search uncovered a 1999 document indicating that Wanigasinghe was an investment manager at National Asset Management, Ltd.

---

[2] The Embassy of the Democratic Socialist Republic of Sri Lanka is located at 2148 Wyoming Avenue, NW, Washington, D.C. 20008. The telephone number is (202) 483-4025.

According to the FBI, its efforts to bring Wanigasinghe before this court were limited to "periodically" checking NCIC to ensure that the warrant for Wanigasinghe still was active so that he would be arrested if he ever were to return to the United States. Apparently, the FBI made no other effort on any front to locate Wanigasinghe.

In 2002, Wanigasinghe prepared to emigrate from Sri Lanka to Canada for employment purposes. According to Wanigasinghe, this required him to provide evidence of a criminal background check. Wanigasinghe contacted the United States Embassy in Colombo; on April 26, 2006 the consular advised Wanigasinghe that a record check done by the National Visa Center had not disclosed any "prior arrest data." An FBI check was returned to Wanigasinghe on or about March 19, 2002 indicating "no arrest record." A February 1, 2002 Wisconsin Department of Justice "criminal history single name record request" revealed "no record." In his applications to these agencies, Wanigasinghe used his real name and his street address in Colombo.

Wanigasinghe emigrated to Canada in June 2003, and lived and worked there under his own name. Canada has an extradition treaty with the United States. Wanigasinghe became a Canadian citizen in August 2006.

On March 17, 2007 Wanigasinghe attempted to enter the United States through upstate New York. A records check at the border disclosed the still-active 1995 warrant. Wanigasinghe was arrested and brought before the federal court in Buffalo. This was the first time Wanigasinghe actually became aware that a federal indictment had been returned against him. The court in New York released Wanigasinghe on conditions and ordered him to report to this

district for further proceedings. This court arraigned Wanigasinghe on April 4, 2007. On May 3, 2007 Wanigasinghe filed a speedy trial demand. *See* Dkt. 8.

## ANALYSIS

The Sixth Amendment guarantees that " in all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." Wanigasinghe contends that the government has violated this right, citing to *Barker v. Wingo*, 407 U.S. 514 (1972) and *Doggett v. United States*, 505 U.S. 647. The government agrees that these cases (and their circuit court progeny)[3] control the analysis, but disagrees as to the appropriate result on these facts.

In *Barker*, the Court held that courts reviewing speedy trial claims, were to review: (1) the length of delay; (2) the reason for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. Absent a delay that could be deemed presumptively prejudicial, courts did not need to inquire into the other facts. *Id*. at 530. In determining whether a delay is presumptively prejudicial, a court must look at the "peculiar circumstances of the case." *Id*. Generally, the extent of any prejudice to the defendant caused by a delay is determined by looking at: (1) preventing oppressive pretrial incarceration; (2) minimizing the defendant's anxiety and concern; and (3) the possibility of impairing the accused's ability fully

---

[3] Both sides have cited and argued the smattering of circuit court decisions confronting this issue. *See United States v. Tchibassa*, 452 F.3d 918 (D.C. Cir. 2006); *United States v. Ingram*, 446 F.3d 1332 (11th Cir. 2006); *RaShad v. Walsh*, 300 F.3d 27 (1st Cir. 2002); *Wilson v. Mitchell*, 250 F.3d (6th Cir. 2001); *United States v. Brown*, 169 F.3d 344 (6th Cir. 1999). None of these cases presents sufficiently analogous facts or insights into *Barker* or *Doggett* to require exegesis by this court. Each court seems to apply the relevant factors in a defensible but subjective fashion to support its decision to grant or deny dismissal.

5

to defend himself. *Id*. at 532. This third concern is the most important because a defendant's inability adequately to prepare his case skews the fairness of the entire system. *Id.* But the Court cautioned that these four factors have no talismanic power; they are to be considered in conjunction with other relevant factors as part of a "difficult and sensitive balancing process." *Id*. at 533.

The Court picked up this thread in *Doggett*, 505 U.S. 647, noting that impairment of a defendant's defense was the most difficult form of speedy trial prejudice to prove because time's erosion of exculpatory evidence and testimony rarely can be shown. *Id*. at 655. Obviously, the factors are weighed differently when dealing with a defendant who is not incarcerated and arguably unaware that he even faces charges. As the Court acknowledged in *Doggett*, excessive delay presumptively compromises the reliability of a trial in ways that neither party can prove, or for that matter, identify. *Id*. at 656. As the Court noted in a subsequent case, "*Barker v. Wingo* expressly rejected the notion that an affirmative demonstration of prejudice was necessary to prove a denial of the constitutional right to a speedy trial." *Moore v. Arizona*, 414 U.S. 25, 26 (1973).[4] Even so, "such presumptive prejudice cannot, by itself, carry a Sixth Amendment claim without regard to the other *Barker* criteria." Rather, presumptive delay is part of the mix of relevant facts and its importance increases with the length of delay. 505 U.S. at 656.

This segued to the Court's consideration of how to factor the government's diligence into the mix. At one extreme, if the delay was caused by the government's need to track down a

---

[4] *Moore* dealt with the more common scenario of an incarcerated defendant whom the state declined to bring to trial in a timely fashion. *Id*. at 25.

6

defendant who had gone into hiding and the government pursued him with reasonable diligence, then that defendant's speedy trial claim upon apprehension almost certainly would fail. At the other extreme, if the government intentionally held back its prosecution in order to gain some impermissible tactical advantage over a defendant, then the government's bad faith would present an overwhelming case for dismissal. 505 U.S. at 656-57.

Between lies the vast middle, which presents this question: how is a court to analyze the government's *negligence* in bringing the accused to trial? Understanding that block quotes are tedious and that long block quotes are excruciating, I'm going to employ one anyway because the Court's observations in *Doggett* seem particularly on point in answering the salient question in Wanigasinghe's case:

> While not compelling relief in every case where bad-faith delay would make relief virtually automatic, neither is negligence automatically tolerable simply because the accused cannot demonstrate exactly how it has prejudiced him. . . .
>
> . . . Although negligence is obviously to be weighed more lightly than a deliberate intent to harm the accused's defense, it still falls on the wrong side of the divide between acceptable and unacceptable reasons for delaying a criminal prosecution once it has begun. And such is the nature of the prejudice presumed that the weight we assign to official negligence compounds over time as the presumption of evidentiary prejudice grows. Thus, our toleration of such negligence varies inversely with its protractedness and its consequent threat to the fairness of the accused's trial. Condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. The Government, indeed, can hardly complain too loudly, for

7

> persistent neglect in concluding a criminal prosecution indicates an uncommonly feeble interest in bringing an accused to justice; the more weight the Government attaches to securing a conviction, the harder it will try to get it.
>
> To be sure, to warrant granting relief, negligence unaccompanied by particularized trial prejudice must have lasted longer than negligence demonstrably causing such prejudice. But even so, the government's egregious persistence in failing to prosecute Doggett is clearly sufficient. The lag between Doggett's indictment and arrest was 8½ years, and he would have faced trial 6 years earlier than he did but for the Government's inexcusable oversights. The portion of the delay attributable to the Government's negligence far exceeds the threshold needed to state a speedy trial claim; indeed, we have called shorter delays "extraordinary." When the Government's negligence causes delay six times as long as that generally sufficient to trigger review, and when the presumption of prejudice, albeit unspecified, is neither extenuated as by the defendant's acquiescence, nor persuasively rebutted, the defendant is entitled to relief.

*Doggett v. United States*, 505 U.S. at 656-68.

Wanigasinghe contends that this decision compels the court to grant him relief, since his situation is worse even that Doggett's. The government responds that Wanigasinghe's case is factually distinguishable. In *Doggett,* the government brought federal drug charges against Doggett in February 1980, but he left the country prior to arrest, with no apparent knowledge of the charges. The DEA later learned that Doggett was imprisoned in Panama, but after it requested that Panama expel Doggett back to the United States, never followed up. Panama did not honor this request, instead releasing Doggett, who traveled to Colombia, South America. The government made no further attempt to locate Doggett. Therefore, the government was

unaware that Doggett returned to the United States in 1982, married, earned a college degree, found a job, lived openly under his own name, and stayed within the law. The Marshals Service "discovered" Doggett during a mundane credit check against old outstanding warrants; this led to Doggett's arrest in September 1988, 8½ years after indictment. The district and appellate courts both denied Doggett's motion to dismiss the indictment on speedy trial grounds; the Supreme Court reversed. 505 U.S. at 648-651.

So how do Wanigasinghe's facts match up against those presented in *Doggett*? The government's key contention is that Wanigasinghe, unlike Doggett, *knew* that charges would follow his blatant bank fraud, and that his exit from this country was to avoid apprehension and prosecution. Wanigasinghe swears that he did not know of the charges until his arrest, and that his departure from the U.S. was because his visa had expired, not because he was fleeing the law.

The government's theory has the tail wagging the dog. It would be more accurate to conclude–as I do–that Wanigasinghe was motivated to leave the U.S. by the expiration of his visa, and that he timed his alleged bank frauds to occur just prior to departure in order to minimize the risk of detection and apprehension.

Does it follow ineluctably from this that Wanigasinghe *knew* that criminal charges would follow? No, not even using the struthious doctrine that avoiding knowledge may be deemed constructive knowledge. To be sure, it would have been logical for Wanigasinghe to *assume* that charges might be filed against him for merrily papering Eau Claire with $20,000 in bad checks.

But it *also* would have been logical for Wanigasinghe to assume that, notwithstanding the scope and disrespectful audacity of his alleged *adieu* to Eau Claire's banking community, the

9

locals might not file any charges at all because they lacked the resources or the will to pursue him to the other side of the world. Wanigasinghe logically could have surmised that the cost/benefit ratio tilted steeply against each individual bank chasing a couple thousand dollars to a distant continent. (Indeed, the government's post-indictment non-pursuit of Wanigasinghe tends to supports this view). Wanigasinghe returned to his homeland (a nation friendly to and diplomatically tied to the United States), used his own name, held a job in his field and maintained contact with UW-Eau Claire over the years, hardly the conduct one would expect of a criminal attempting to elude detection.

To the same effect, when Wanigasinghe sought information about his arrest records from state and federal law enforcement agencies in 2002, he demonstrated no concern about "surfacing" after seven years abroad. It would be illogical to conclude, as the government suggests, that Wanigasinghe was "testing the waters" prior to returning to the U.S., because he wasn't returning to the U.S., he was emigrating from Sri Lanka to Canada.[5] If Wanigasinghe was concerned with calling himself to the attention of the FBI or the Eau Claire D.A., he would have been more circumspect about putting his name back into play, even for something as seemingly mundane as a records check.

So, on Wanigasinghe's side of the ledger, we have an alleged audacious swindler ambling about for eight years from 1995 to 2003 in plain sight in Colombo, all but announcing to the

---

[5] As the government itself observes, if Wanigasinghe wished to test the waters, this was the wrong way to do it because the records check showed merely that he never had been arrested. We do not know what the FBI would have told Wanigasinghe if he had called and asked: "Is there an active warrant for my arrest?"

FBI (and the ECPD, I suppose), "If you want me, come and get me." But the FBI did absolutely nothing. No phone calls to UW-Eau Claire to ask if the people in job placement or alumni relations had any inkling where Wanigasinghe might be. No phone calls or teletypes to INS to ask about a Sri Lankan in Wisconsin whose visa would have expired recently. No contact with investigative or diplomatic officials in Sri Lanka (or Singapore) to run a check by name, d.o.b. and physical description. Rather than go out hunting for Wanigasinghe, the FBI chose to rig a passive snare at the U.S. border in the hopes that maybe someday–or some year–Wanigasinghe would pass back through. He did, but not until 11½ years had passed, exceeding the time span that elicited opprobrium from the Court in *Doggett.*

Had the FBI done *anything* to locate Wanigasinghe, then this court might be justified in excluding 2003 - 2007 from the calculation because it is not clear that the FBI could have detected Wanigasinghe's emigration from one foreign country to another. But having chosen indolence as its investigative strategy, the FBI was no more or less ignorant as to Wanigasinghe's whereabouts after 2003 as before. The bottom line shows over a decade of placid inaction evincing no hope or plan of apprehending Wanigasinghe absent a serendipitous border crossing that grew less likely with each passing year. Given the Supreme Court's stridency in *Doggett*, 11½ years of investigative lethargy seems to augur dismissal of the indictment.[6]

---

[6] If my choice of verbs and adjectives imply a criticism of the government's search efforts, it's not because this court presumes to know better than the FBI what the Bureau's priorities should be, it's because the Supreme Court's decision in *Doggett*, issued almost three years prior to Wanigasinghe's indictment, should have alerted the government that Speedy Trial jurisprudence had veered in a new direction. The government knew or should have known that its failure ever to make even a token attempt to locate Wanigasinghe would, over time, jeopardize its indictment.

11

But the government has one remaining counter-argument: there is no proven actual prejudice to Wanigasinghe from the delay. As the government correctly observes, this appears to be a paradigmatic "paper" case with no genuine reliance on any fact witnesses. To the extent that there are any event witnesses for the government, for instance Wanigasinghe's ex-girlfriend and maybe his landlord, any memory loss on their part probably would inure to Wanigasinghe's benefit. Wanigasinghe is not claiming in his affidavits that his memory of material events has faded.

This is a good point. If the court is disinclined to dismiss, this would be the best support for denying Wanigasinghe's motion. A 2007 trial in this case likely would be materially indistinguishable from a 1995 trial. Perhaps this constitutes the "persuasive rebuttal" to which the Court referred in *Doggett*. *See also* 505 U.S. at 659-60 (Thomas and Scalia, JJ. And Rehnquist, C.J., dissenting)(it is "extraordinary" for Court to conclude that Doggett's Sixth Amendment right was violated even though he suffered none of the harms the right was designed to protect).

> As the dissent noted in *Doggett*,
>
> > Today's opinion . . .will transform the courts of the land into boards of law enforcement supervision. For the Court compels dismissal of the charges against Doggett not because he was harmed in any way by the delay between his indictment and arrest, but simply because the Government's efforts to catch him are found wanting. . . . Our function, however is not to slap the government on the wrist for sloppy work or misplaced priorities, but to protect the legal rights of those individuals harmed thereby. By divorcing the Speedy Trial Clause from all considerations of prejudice to an accused, the Court positively invites the Nation's judges to indulge in ad hoc and result-driven second guessing of

>the government's investigatory efforts. Our Constitution neither contemplates nor tolerates such a role.

505 U.S. at 670-71 (Thomas and Scalia, JJ. And Rehnquist, C.J., dissenting).

But the Court's actual opinion in *Doggett* held otherwise: there is an inverse relationship between the amount of prejudice a defendant must establish and the length of the negligent delay in trying him. One logically could infer that at least on some level, the Court's decision rests on the doctrine of repose, but despite asking the parties to brief this point in *Doggett*, the Court did not address it. *See* 505 U.S. at 660 & 660 n.1 (Thomas and Scalia, JJ. And Rehnquist, C.J., dissenting). *Doggett* seems to hold that there is a point on the graph where the post-indictment delay is so long that the presumption of prejudice becomes irrebuttable. The location of that point is influenced by other salient factors, and, apparently, by the trial court's subjective notion as how long is too long.

So let's add up the tally for Wanigasinghe: The delay between his indictment and arrest was 11½ years. Wanigasinghe's reason for leaving the U.S. was because his visa had expired, but he executed an easily-detected fraud scheme timed to coincide with his permanent departure from this country. From the way these events transpired, it would be equally logical to conclude that Wanigasinghe should have known that criminal charges would be filed against him, or conversely, that Wanigasinghe would be justified in believing that no one would pursue him or was pursuing him. There is no proof, however, that Wanigasinghe actually knew that charges had been filed against him. Wanigasinghe made no attempt to hide his location or identity from anyone and could have been located quickly with minimal effort. The government, however,

made no effort to locate him notwithstanding access to solid clues and relatively cost-free resources.  Wanigasinghe's tangential contacts with state-side law enforcement agencies during his emigration to Canada could not have alerted him to the presence of an arrest warrant but they at least had the potential to alert the FBI to Wanigasinghe's whereabouts.

Because there is no proof that Wanigasinghe actually knew about the charges prior to his arrest in 2007, Wanigasinghe could not have demanded a speedy trial any earlier than he did.  There is no showing of any actual prejudice to Wanigasinghe from the 11½ year delay, but pursuant to *Doggett*, prejudice is presumed from the length of the delay.

Although I am more persuaded by the dissent's view in *Doggett*, it's the dissent.  Under the actual holding of *Doggett,* I conclude that these facts establish a violation of Wanigasinghe's right to a speedy trial.  Therefore I am recommending that this court grant Wanigasinghe's motion to dismiss the indictment.  If the district judge disagrees with this recommendation, then there are facts and circumstances that may justify a different conclusion.

RECOMMENDATION

Pursuant to 28 U.S.C. §636(b)(1)(B) and for the reasons stated above, I recommend that this court grant defendant Udara Wanigasinghe's motion to dismiss the indictment with prejudice.

Entered this 29th day of June, 2007.

BY THE COURT:

/s/

STEPHEN L. CROCKER
Magistrate Judge

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
120 N. Henry Street, Rm. 540
Post Office Box 591
Madison, Wisconsin 53701

Chambers of
STEPHEN L. CROCKER
U.S. Magistrate Judge

Telephone
(608) 264-5153

June 29, 2007

Timothy O'Shea
Assistant U.S. Attorney
P.O. Box 1585
Madison, WI 53701-1585

Reed Cornia
Delyea and Cornia, LLC
520 University Avenue, Ste. 260
Madison, WI 53703

    Re:   United States v. Wanigasinghe
         Case No. 95-CR-073-C

Dear Counsel:

    The attached Report and Recommendation has been filed with the court by the United States Magistrate Judge.

    The court will delay consideration of the Report in order to give the parties an opportunity to comment on the magistrate judge's recommendations.

    In accordance with the provisions set forth in the newly-updated memorandum of the Clerk of Court for this district which is also enclosed, objections to any portion of the report may be raised by either party on or before July 9, 2007, by filing a memorandum with the court with a copy to opposing counsel.

    If no memorandum is received by July 9, 2007, the court will proceed to consider the magistrate judge's Report and Recommendation.

                             Sincerely,

                                            Connie A. Korth
                                            Secretary to Magistrate Judge Crocker

Enclosures
cc:    Honorable Barbara B. Crabb, District Judge