IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

UNITED STATES OF AMERICA,

                    Plaintiff,

      v.

UDARA A. WANIGASINGHE,

                    Defendant.

OPINION AND ORDER

95-CR-0073-C

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Udara A. Wanigasinghe attempted to re-enter the United States from Canada on March 19, 2007 and was arrested immediately on an indictment returned against him in August 1995 in this judicial district.  The government wants to prosecute defendant Wanigasinghe for an alleged scheme to defraud six Eau Claire, Wisconsin banks in the spring of 1995, just before his visa to study in the United States expired.  Defendant contends that any prosecution would violate his Sixth Amendment right to a speedy trial.  Citing Doggett v. United States, 505 U.S. 647 (1992), and Barker v. Wingo, 407 U.S. 514, 530 (1972), he argues that his speedy trial rights were violated by the government's failure to make any effort to find him after he was indicted on August 30, 1995  Given the eleven and a half years that passed before he was arrested trying to re-enter the country, he believes that he

1

has been relieved of any obligation to demonstrate that he has been prejudiced by the delay. He contends that the government cannot rebut the resulting presumption of prejudice, that he had no duty to invoke his right to a speedy trial because he did not know he had been indicted and that the indictment against him must be dismissed.

I conclude that despite the government's failure to make any effort to find defendant, Doggett does not require a decision in defendant's favor. From the evidence adduced by the government, I find that defendant committed crimes knowing that he would be leaving the country immediately because his student visa was expiring and that he took a number of steps intended to deter any efforts to find him outside the country. Although he had strong reasons to know that he would be charged with the crimes he had committed, he never asked for a speedy trial in the long interval that he remained outside the United States. The circumstances of his leaving, his almost certain knowledge that he had committed crimes for which indictment would be likely to follow and his failure to insist on his speedy trial rights outweigh any negligence of the government in not searching for a non-citizen who had left the country voluntarily and was not expected to come back.

The case has been the subject of one abbreviated evidentiary hearing before the United States Magistrate Judge and a lengthier one before the district court. Following the hearing before him, the magistrate judge issued a comprehensive report, recommending reluctantly in light of Doggett, 505 U.S. 647, that the court dismiss the indictment on the

2

ground that defendant's speedy trial right had been violated by the government's failure to make any significant efforts to locate him and bring him back to this country for trial. The magistrate judge found the government's absence of efforts in this regard particularly hard to understand in view of defendant's averments to the effect that (1) he was in "constant touch" with the University of Wisconsin-Eau Claire on various matters after he left Eau Claire; (2) the university had defendant's contact information readily available from the registration office; (3) defendant was in contact with the American Embassy in Colombo in connection with background checks he needed in order to emigrate to Canada; (4) defendant used his own name in Sri Lanka and held a job there; and (5) the government had not made any inquiry of the government of Sri Lanka about the possibility that defendant might be residing there.

Following entry of the magistrate judge's report in this case, the government moved to re-open the hearing to allow it to adduce additional evidence about defendant's actions before leaving the United States in 1995 and the extent to which defendant had kept in touch with the university in the years following his graduation. In an opinion entered on August 2, 2007, I denied the motion to re-open on the ground that new evidence was not necessary because, in my view, Doggett was not controlling.

In response to the court's order, the government moved again to re-open the evidentiary hearing. It sought an opportunity to put in evidence supporting its contention

3

that, as part of his scheme to defraud the Eau Claire banks, defendant took steps to conceal his destination from law enforcement agents who might try to bring him to justice in this country.  The government reasoned that if it did not adduce such evidence before the district court, it would be barred from arguing on appeal that defendant was more to blame than the government for any delay.  I granted the motion to re-open and held a hearing on September 20, 2007.  From the evidence adduced at that hearing and from the entire record, I make the following findings of fact.

FINDINGS OF FACT

Defendant Udara A. Wanigasinghe was living in his native country, Sri Lanka, when he applied for admission to the University of Wisconsin-Eau Claire in 1989.  His application showed an address in Sri Lanka of 28 Railway Avenue, Colombo-05.  Defendant was admitted to the university and he obtained a student visa to study in this country from January 1990 until April 1995.

Soon after defendant arrived in Eau Claire, he began dating Kimberly Russell.  In September 1994, she moved into his apartment at 639 Broadway Street, #5, Eau Claire, Wisconsin, where he continued to live after his spring 1994 graduation.  She remained there until February 1995 when she broke off the relationship over a disagreement about the timing of a trip to Sri Lanka.  Defendant wanted Russell to go with him to Sri Lanka in

4

April; she wanted to finish her semester of teaching before leaving.

At his last meeting with Russell on April 16, 1995, defendant told her that he had obtained employment in Cincinnati, Ohio, that he would be moving there and that he would send her his contact information once he was settled.  In a letter to Russell postmarked April 20, 1995, defendant wrote that their separation was permanent and that he would be "living in Sri Lanka once I get old," because that was where his investments would be made.

Before leaving the Eau Claire area, defendant wrote to his landlord, Marty Fisher-Blakeley, telling her that he had obtained an internship in Singapore and was planning to return to Eau Claire in August to finish his master's degree.  He said he would be moving from his apartment at 639 Broadway St. by April 30, 1995, and he enclosed a check for his May rent.  Fisher-Blakely deposited that check and another rent check from defendant, dated April 16, 1995.  Both were returned to her unpaid, one because of insufficient funds and one because the account had been closed.

A grand jury indicted defendant for six counts of bank fraud in an indictment returned on August 30, 1995.  FBI Special Agent Jerry Southworth told the grand jury that he had a "rough idea" that defendant had fled to either Singapore or Sri Lanka.

The government entered an arrest warrant for defendant in the National Crime Information Center computerized index on August 31, 1995.  The warrant was validated periodically between then and defendant's arrest on March 17, 2007, to make sure that it

5

remained active in the data base in the event defendant tried to return to the United States. The government did not check defendant's address records at the university, look for defendant on the internet or make any inquiries of the Sri Lankan or Singapore governments about his whereabouts. The United States has an extradition treaty with Sri Lanka.

As of late 1994 until the present, the Registrar of the University of Wisconsin-Eau Claire had two addresses for defendant: 639 Broadway Street, Apt. 5, Eau Claire, Wisconsin and 778 Quarray Road, Jakarta, Singapore. The Jakarta address was added on September 8, 1994. The Director of Alumni Relations had no other address for defendant, had never received an email address or telephone number for him, had never received a donation from him, had never made contact with him through alumni telemarketing efforts and had no information that he had ever been in contact with the office to update his profile. The university did have a copy of his original application, which showed that as of the time of his 1989 application, his home address was Colombo, Sri Lanka, but this address was not part of the registrar's records for defendant. However, at some time, the registrar sent defendant a copy of his academic transcript at his Railway Avenue address.

GOVERNMENT'S ALLEGATIONS

According to the government, defendant opened accounts at four Eau Claire banks between March 15, 1995 and April 3, 1995, while maintaining two accounts he already had

6

at the Royal Credit Union and First Federal Savings of La Crosse.  To open one of the accounts, at Norwest Bank, he used a U.S. Treasury check made payable to Asela T. Dissanayake, a fellow Sri Lankan who had stayed with defendant for a few days before returning to Sri Lanka in the spring of 1994.  Dissanayake's address on the Treasury check was shown as the same as defendant's:  639 Broadway St., Apt. 5, Eau Claire, WI.

On March 15, defendant began depositing checks at the banks.  In each instance, he used a check drawn against a closed Westconsin Credit Union account in the name of Kimberly Russell and a check obtained through a Discover credit card purportedly issued to Asela T. Dissanayake.  Defendant endorsed the deposited checks.  (Russell discovered that she was missing a book of credit union checks after she moved out of defendant's apartment.).  Russell told the grand jury that she did not write the checks and identified the handwriting on the checks as defendant's, which she had come to know well while they were dating, particularly after typing papers for him.

The government alleges that after defendant had deposited $26,000 in forged checks to the six banks, he began to withdraw cash from five of the banks, starting on April 17, 1995.  In addition to these withdrawals, which are the subject of counts 1-4 and 6 of the indictment, defendant wrote checks totaling $2,677 against the fraudulently inflated balance in his Norwest account during the month before he left.  (Count 5).  In addition, he accumulated credit card charges of $2,882 that were never paid but which were not charged

7

in the indictment.

In opening the new accounts, defendant used his 639 Broadway Street address.  At Charter Bank, he gave as his permanent address "1708 Bloomer Place, Bloomer, MN 60615."  There is a town of Bloomer in northern Minnesota but no 1798 Bloomer Place in that town and the 60615 zip code is assigned to the Chicago area.


### DEFENDANT'S AFFIDAVITS

According to an affidavit defendant swore to on May 30, 2007, he was in constant touch with the University of Wisconsin-Eau Claire on various matters after he left school and the university had his contact information available from the registration office. including a copy of his official transcript.  Dft.'s Aff., attached to Dft.'s M. to Dism., dkt. #9.  According to the affidavit he swore to on June 22, 2007, defendant returned to Sri Lanka in 1995 and resided there at No. 28 Railway Ave., Colombo-05 until he left for Canada in 2002.  Dft.'s Aff., in Supp. of Dft.'s Reply Br., dkt. #19.  In 2001, defendant began looking for new employment and began preparations for moving to Canada.  Dft.'s Aff. in Supp. of Reply Br., dkt. #19.  In 2002, in preparation for emigration, he was required to provide a criminal background check from both the Federal Bureau of Investigation and the Wisconsin Department of Justice.  Id.  He began the application process, which involved a background check extending over the previous ten years.  To obtain information about his

8

years in the United States, he went to the United States Embassy in Sri Lanka and presented his passport, filled out forms, including one for the FBI, had his fingerprints taken and obtained a form for the Wisconsin Department of Justice.  (The forms were returned showing no record of arrests or convictions.).  He secured employment with a Canadian firm and emigrated to Canada, where he gained his citizenship in 2006.  Dft.'s Aff., dkt. #28.

According to an affidavit submitted by an employee of defendant's counsel's law firm, a computer search conducted in mid-1999 would have unearthed a reference to a person named Udara Wanigasinghe and his employer, National Asset Management Ltd., in a collection of articles about business matters in Sri Lanka at http://lakdiva.org/suntimes/990711/busm.html.  Aff., dkt. #21.

OPINION

In the order entered on August 3, 2007, I held that the government was not negligent in doing no more than merely registering the fact of an arrest warrant in the National Crime Information System and taking no other steps to bring to trial a non-citizen who has left the country.  That holding was unnecessarily broad.  The narrower question is whether the government's failure to make any effort to locate *this* defendant and return him to this country was official negligence that outweighs defendant's failure to invoke his right to a speedy trial.

9

From the evidence adduced at the evidentiary hearing, I find that it is more probable than not that defendant was a knowing fugitive from justice.  He saw the imminent expiration of his visa as an opportune time to undertake a scheme to defraud the local banks and at least one credit card company.  He made his deposits at six different banks, with no deposit large enough to invite close scrutiny.  Defendant timed his withdrawals to occur in the short period before he left Eau Claire in mid-April.

As defendant prepared to leave, he took steps intended to make it difficult for him to be found, in the unlikely event anyone tried.  He gave an impossible address to the registrar, putting the Indonesian city of Jakarta in the country of Singapore; he gave another impossible address to Charter Bank, listing a fake street address in Bloomer, Minnesota (a town of 92 in northern Minnesota) and giving it a Chicago zip code; he told his former girl friend that he had a job in Cincinnati; and he told his landlord that he was going to Singapore and planned to return at the end of the summer.  (Defendant argues that the address in the registrar's office could be the mistyping of a careless student employee, but he has nothing but speculation to support his argument.  On the other hand, the government has the Bloomer, Minnesota address to support its position that defendant was not above falsifying addresses to suit his purposes.).

The only reasonable conclusion to draw from defendant's conduct is that he thought he had a good chance of avoiding any prosecution for the alleged check scheme, given its size

10

in relation to the difficulty and expense of finding and extraditing him, but he took additional precautions to increase the likelihood that government law enforcement agencies would be hampered in their efforts to locate him.  If he did not go so far as to live under a different name, he would not have needed to.  He was a long way from Eau Claire, Wisconsin, and as far as he was aware, no one knew his address or even what country he was living in.  Timing one's crimes to coincide with a deadline to leave the country is no different in its effect from fleeing the country to avoid prosecution.  Defendant's intention was to avoid being prosecuted for the crimes he allegedly committed in Eau Claire.  The manner of his leaving not only increases the probability that he committed the crimes for which he was later indicted but makes it more obvious that he was trying to make it difficult for American law enforcement agents to find him.

Defendant argues that if he really wanted to avoid responsibility for his crimes, he would not have lived publicly in Sri Lanka, would not have lived at his parents' home, would not have gone to the American Embassy in Sri Lanka or contacted the FBI and Wisconsin Department of Justice, would not have tried to re-enter the United States and would not be showing up for appearances in this court.  As I have noted, defendant has not proved that he lived publicly in Sri Lanka or at his parents' home or, even if both these things were true, that he had any fear he would be found in Sri Lanka.  As for visiting the American Embassy, the evidence is that he did not do this until 2001, six years after he had left the United States

11

when he may well have believed he would not be prosecuted.  He suggests that the embassy would have had the capability to check the criminal records of embassy visitors in the National Crime Information System, but he has adduced no evidence to support this suggestion.  Indeed, it is improbable that the embassy would check on the background of a visitor who was not applying for a visa to enter the United States.

Unlike the magistrate judge, I am not persuaded that Doggett requires dismissal.  I do not read that case or any of the cases from the Court of Appeals for the Seventh Circuit as requiring law enforcement agencies to search outside the country for non-citizens indicted here whose whereabouts are unknown and who, not being citizens, would be unlikely to return.  In Doggett, 505 U.S. at 652-53, the Court did not hold the government negligent for its lack of effort to find Doggett in Panama or Columbia but for its lack of effort to find him after he was back in this country.  The Court emphasized that "[f]or six years, the Government's investigators made no serious effort to test their progressively more questionable assumption that Doggett was living abroad."  Id.  This suggests that the Court expects the government to make vigorous efforts within the United States to find indicted persons, but not necessarily to make such efforts outside the United States.

Even if Doggett requires the government to take steps to locate and return non-citizens to this country for trial at risk of losing their ability to prosecute them if they do return, the government's failure to take those steps in this case does not outweigh defendant's failure to

12

invoke his right to a speedy trial.  Given the Court's statement in <u>Doggett</u>, that if the facts had shown that Doggett had known of the indictment against him, <u>Barker</u>'s third factor "would be weighed heavily against him," <u>id.</u> at 653, it is fair to conclude that a defendant who leaves the country when he knew or should have known of the likelihood of prosecution is not entitled to the protection of the Sixth Amendment if he never invokes his right to a speedy trial.

Moreover, defendant has not suggested that he has been prejudiced by the delay in his prosecution.  It would be difficult for him to do so.  This is a case that in all likelihood will be tried almost exclusively on the documents in the government's possession showing defendant's account opening cards, the checks he is alleged to have written and deposited and the bank records showing the losses they incurred.  His best, if not his only chance of acquittal depends on showing that the handwriting in question is not his.  The passage of time would not impair his ability to find and utilize a handwriting expert.  Indeed, if I agreed with defendant that the government's negligence outweighs his own failure to seek a speedy trial, this might be that rare case that the Supreme Court conjectured would amount to a "persuasive rebuttal" of defendant's claim of presumptive prejudice.

ORDER

IT IS ORDERED that the report and recommendation entered by the United States

13

Magistrate Judge on June 29, 2007, is NOT ADOPTED.  FURTHER, IT IS ORDERED that

defendant Udara A. Wasnigasinghe's motion to quash the indictment against him on the

ground that proceeding to trial on that indictment would violate his right to a speedy trial

under the Sixth Amendment is DENIED.

Entered this 2d day of November, 2007.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge

14